1

2

3                    **UNITED STATES DISTRICT COURT**

4                          **DISTRICT OF NEVADA**

5

6   UNITED STATES OF AMERICA,              )

7                           Plaintiff,     )      Case No.  2:09-cr-00057-RLH-GWF
                                           )
8   vs.                                    )      **FINDINGS &**
                                           )      **RECOMMENDATIONS**
9                                          )
    WILLIE DILLARD,                        )
10                                         )
                            Defendant.     )      Motion to Suppress Evidence - #24
11  _____)

12          This matter is before the Court on Defendant's Motion to Suppress Evidence (#24), filed on

13  September 23, 2010, and the Government's Opposition to Defendant's Out of Time Motion to

14  Suppress Evidence (#27), filed on October 12, 2010.  The Court conducted an evidentiary hearing

15  on November 23, 2010 and heard oral argument on December 3, 2010.

16          The indictment in this case charges Defendant Willie Dillard with the crime of felon in

17  possession of a firearm in violation of  18 U.S.C. § 922(g)(1) and 924(a)(2).  The charge arises out

18  of the alleged discovery of a semi-automatic handgun in Defendant's vehicle on October 11, 2008.

19  Defendant's instant motion seeks to suppress the evidence regarding the handgun on the grounds

20  that the search of his vehicle violated the Fourth Amendment.  Defendant also moves to suppress

21  statements allegedly made by him after he was in custody based on the officers' failure to advise

22  him of his *Miranda* rights.  Finally, Defendant seeks to suppress evidence resulting from the

23  incident based on the Government's or the police's failure to preserve exculpatory evidence.

24                          **FACTUAL BACKGROUND**

25          Officer Brett Ficklin testified that on October 11, 2008, he was working as a patrol officer

26  for the Las Vegas Metropolitan Police Department (LVMPD).  On that day, Officer Ficklin was

27  accompanied by a "COPS" television program film crew which consisted of a cameraman and a

28  sound man, and their respective equipment.  To accomodate the presence of the COPS film crew,

1   Officer Ficklin was operating a Dodge pick-up truck instead of his usual patrol car.  The pick-up
2   truck was marked with police colors and insignia and was equipped with the standard police siren
3   and emergency lights.
4           At approximately 5:46 p.m., Officer Ficklin was stopped for a traffic signal at the
5   intersection of Sahara Avenue and Paradise Road in Clark County, Nevada.  Officer Ficklin's
6   vehicle was in the No. 3 or right eastbound travel lane on Sahara Avenue and was two or three
7   vehicles back from the intersection.  A Toyota Camry was in the No. 2 or middle eastbound travel
8   lane and was the first vehicle occupying that lane.  While the traffic signal was still red, Officer
9   Ficklin observed the operator of the Toyota Camry make a right turn from the No. 2 lane, cross in
10  front of the first vehicle in the No. 3 travel lane, and nearly collide with a vehicle in the right turn
11  lane on Sahara which was also turning onto southbound Paradise.[1]  Officer Ficklin decided to stop
12  the Toyota Camry for a traffic violation.  After turning onto Paradise, Officer Ficklin caught up to
13  the Toyota Camry at the intersection of Paradise Road and Karen Street.  Officer Ficklin waited
14  until the Toyota passed through the intersection and then activated his emergency lights and siren.
15  The Toyota stopped in the right travel lane on Paradise Road.  There was no parking lane or
16  shoulder at that location.
17          Officer Ficklin approached the driver's side door of the Toyota Camry and made contact
18  with Defendant Willie Dillard who was the sole occupant of the vehicle.  Officer Ficklin told Mr.
19  Dillard that he stopped his vehicle because he crossed two lanes of traffic and nearly hit another
20  vehicle.  He asked Defendant if there was a reason for that.  Defendant Dillard responded that he
21  thought he had crossed only one lane of traffic.  Officer Ficklin then asked Defendant where he was
22  coming from and where he was going to.  Defendant stated that he had just dropped his girlfriend
23  off at work.  He stated that he was going to another area for a "booty call."  These questions lasted

24  _____

25          [1] Defendant's counsel asserts that Officer Ficklin testified that the vehicle in the right turn
26  lane made an "illegal" right turn.  Having listened to the audio recording of Officer Ficklin's
    testimony, however, the Court confirms that he testified that the vehicle in the right turn lane made
27  a "legal" right turn.  Defendant's counsel simply misheard Officer Ficklin's testimony.  There is
    also nothing in the substance of Officer Ficklin's testimony that would suggest that the vehicle in
28  the right turn lane made an illegal turn.

a minute or two.  Officer Ficklin observed that Defendant's feet were back toward the edge of the driver's seat.  He testified that this was an unusual physical position which made him cautious. Officer Ficklin also stated that Defendant appeared to be nervous.  He observed what appeared to be marijuana particles--stems or seeds--on Defendant's lap.  He also smelled an odor of marijuana coming from the vehicle.  Officer Ficklin asked Defendant what the green substance was on his lap and Defendant appeared to be surprised about its presence.  He told Defendant not to move his hands or reach for anything.  Officer Ficklin asked Defendant if there was anything in the vehicle that he should know about and Defendant stated that he had a "blunt," i.e. a marijuana cigarette.[2] Officer Ficklin asked Defendant about his criminal history and Defendant stated that he had previously been convicted of robbery and had been released from the Nevada state prison a few months earlier.  Defendant also told Officer Ficklin that his driver's license was suspended and he did not have a driver's license in his possession.

Officer Ficklin asked Defendant to exit the vehicle and walk back to the front of the police vehicle.  As Defendant exited his vehicle, Officer Ficklin radioed police dispatch for back-up support.  Defendant Dillard walked to the front of the police vehicle, but then suddenly turned and ran across Paradise Road, through busy traffic.  Officer Ficklin pursued the Defendant as he radioed for assistance and advised dispatch and other officers of what was occurring.  Portions of Defendant's flight and Officer Ficklin's pursuit was captured by the COPS camera.  The Defendant ran into the Las Vegas Hilton parking lot located on the east side of Paradise Road.  Defendant disappeared from Officer Ficklin's sight when he made a turn near the parking garage.  Officer Ficklin found the Defendant hiding under a vehicle in the parking lot.  Officer Ficklin pulled out his firearm and ordered Defendant to lay on his stomach with his arms and legs spread out.  Four

---

[2] Although the telephonic search warrant application that was prepared and submitted by Detective Richard Meyers after Defendant Dillard was taken into custody, makes no mention of Defendant admitting that he had a marijuana blunt in his possession, *Government's Opposition (##27), Attachment "A"*, page 000026, the COPS video of Officer Ficklin's initial encounter with Defendant confirms that he told the officer that he had a "blunt*." Joint Exhibit "1", COPS Video.*

1   other officers arrived in the parking lot in response to Officer Ficklin's call for assistance. Officers

2   Pandulo and Tompkins were two of those officers. The COPS film crew also arrived in the parking

3   lot and recorded portions of the events after Defendant Dillard was found hiding under a vehicle.

4           Defendant was handcuffed, stood up and placed at the front of a patrol car. Officer Ficklin

5   asked Defendant why he fled. Defendant stated he thought there were warrants for his arrest.

6   When Officer Ficklin ran a check on Defendant through the police computer, however, there were

7   no outstanding warrants for his arrest. The records check did confirm that Defendant had a prior

8   felony conviction for robbery. Officer Ficklin testified that Officer Pandulo directed Officer

9   Tompkins, who was undergoing field training, to go and secure Officer Ficklin's and Defendant's

10  vehicles which were still parked on Paradise Road. Officer Pandulo did not specifically instruct

11  Officer Tompkins to impound Defendant's vehicle or to perform an inventory search of it. This is

12  confirmed by the COPS video. *Joint Exhibit "1"*. Officer Pandulo and another officer then walked

13  back along the route of Defendant's flight through the Hilton parking lot and found a small plastic

14  pouch that contained three bundles of marijuana. Officer Ficklin testified that he did not see

15  Defendant drop or throw anything while he was chasing him.

16          Officer Ficklin told Defendant that there were no warrants for his arrest, but that the officers

17  had found the plastic pouch containing the marijuana. He also told the Defendant that he assumed

18  or believed that the Defendant ran because he knew Officer Ficklin would find the marijuana on his

19  person. Officer Ficklin testified that Defendant nodded his head affirmatively in response to this

20  statement. This is also confirmed by the COPS video. While the officers were processing arrest

21  paperwork in the Hilton parking lot, someone, presumably Officer Tompkins, called Officer

22  Pandulo on his cell phone and told him that a gun had been found in Defendant's vehicle. Officer

23  Pandulo instructed Officer Tompkins to stop doing anything further with the vehicle and to "freeze

24  it" until a search warrant could be obtained. Defendant was then placed in the rear seat of one of

25  the patrol vehicles. Officer Ficklin testified that because a gun had been found in Defendant's

26  vehicle, he advised Defendant of his *Miranda* rights. He again asked Defendant about the

27  marijuana. Defendant admitted that the marijuana was his. Officer Ficklin asked Defendant about

28  the handgun that was found in his automobile. Defendant denied any knowledge of a handgun and

4

1   stated that the gun reportedly found in the vehicle was not his.

2          Officer Ficklin and other officers then took Defendant back to Paradise Road where the

3   vehicles were located. Officer Ficklin looked inside Defendant's vehicle and observed a handgun

4   that was partially protruding from beneath the driver's seat. Because Defendant was an ex-felon

5   and a firearm was found in his vehicle, Officer Ficklin contacted a sergeant to have a firearms

6   detective come to the scene. Detective Richard Meyers responded to the scene approximately a

7   half-hour later. Officer Ficklin advised Detective Meyers about what had transpired. Detective

8   Meyers looked inside the vehicle and observed the handgun and then took over the investigation.

9   Officer Ficklin testified that Defendant's vehicle was subsequently released to the registered owner

10  who was contacted and came to the scene to retrieve it.

11         Detective Richard Meyers testified that he was contacted to go to the scene because a

12  firearm had been found in a vehicle being operated by a convicted felon. En route to the scene he

13  spoke with Officer Ficklin and confirmed the circumstances of the incident. Upon arriving at

14  Paradise Road and Karen Avenue, Detective Meyers observed the Defendant in the backseat of the

15  police car. After advising Defendant of his *Miranda* rights, Detective Meyers briefly interviewed

16  the Defendant. Detective Meyers did not ask Defendant to execute a written waiver of his *Miranda*

17  rights. Nor did another officer witness him giving the *Miranda* warnings to the Defendant.

18  Detective Meyers acknowledged that police department policy states that the giving of oral

19  *Miranda* warnings should be witnessed by another officer if possible. Detective Meyers testified

20  that Defendant told him that he regularly smoked marijuana. Defendant denied any knowledge of

21  the firearm. The Defendant allegedly told Detective Meyers that he was in the business of

22  purchasing methamphetamine from Hispanic gang members and then selling it in the African-

23  American community.

24         Detective Meyers thereafter prepared an application for a telephonic search warrant to

25  search the Defendant's automobile for firearms, ammunition and narcotics. In his sworn statement

26  in support of the search warrant application, Detective Meyers stated:

27                 As Officer Ficklin was speaking with Dillard other officers began to
                   do a vehicle inventory due to the fact that Dillard pulled over in the
28                 number three travel lane and the vehicle was not legally parked and

1

was going to be towed, however, once they entered the vehicle they observed in plain view hand grip end of a silver and black handgun. It was at that point that the premise was frozen and Detectives from the LVMPD Firearms Investigations unit responded to the scene.

2

3

4

*Government's Opposition (##27), Attachment "A"*, page 000027.

5

Detective Meyers also informed the judge:

6

Judge also the vehicle in question is not registered to Mr. Dillard it is registered to a third party by the name of Cynthia Stone. Cynthia is not currently presently (sic) and cannot give consent for her vehicle. You affiant prays this search warrant authorized (sic) a night time search for the following reasons. The vehicle is going to be towed, because it not legally parked and the driver Willie Dillard is going to be transported to CCDC and booked accordingly. If the vehicle is towed evidential items that may be inside of the vehicle could be lost.

7

8

9

10

11

*Id.*, page 00028.

12

Detective Meyers testified after the search warrant was issued, the vehicle was searched.

13

The .25 caliber handgun located partially beneath the driver's seat was seized. A bullet was found

14

in the door area. A black bag on the backseat was searched and revealed numerous prescription

15

medications that were apparently in the name of Defendant's girlfriend. The officers also found a

16

box in the trunk which contained numerous rounds of .25 caliber ammunition. Detective Meyers

17

stated that although Defendant's vehicle was initially going to be impounded, the registered owner

18

of the vehicle was contacted, came to the scene and the vehicle was released to her.

19

## DISCUSSION

20

**1.    Whether Evidence of the Handgun, Ammunition or Other Evidence Discovered During the Search of Defendant's Vehicle Should be Suppressed.**

21

22

**(A)    Whether the Initial Stop Was Lawful.** A police officer who has reasonable

23

suspicion or probable cause to believe that a violation of traffic laws has occurred, may stop the

24

vehicle to investigate the infraction. *Whren v. United States*, 517 U.S. 806 (1996); *United States v.*

25

*Lopez-Soto*, 205 F. 3d 1101, 1104-05 (9th Cir. 2000). Officer Ficklin testified that he observed

26

Defendant make a right turn from the middle eastbound travel lane of Sahara Avenue onto

27

southbound Paradise Road and nearly collide with a vehicle turning from the right turn lane.

28

Nevada Revised Statute (NRS) Section 484.333.1 states that a right turn at an intersection must be

6

1    made from the right turn lane if the highway has a right turn lane or from the extreme right lane.

2    Officer Ficklin therefore had probable cause to stop Defendant's vehicle for making an illegal right

3    turn.

4           **(B)**     **Warrantless Search of Automobile Based on Probable Cause**.  Although the

5    police obtained a search warrant for the vehicle, Defendant argues that the search warrant was only

6    sought after the police had already conducted an unlawful search of the vehicle.  Defendant argues

7    that the police did not follow police department procedures for conducting an inventory search to

8    impound the vehicle and the initial search therefore cannot be justified on this basis.  The

9    Government did not call Officer Tompkins, who initially observed the handgun in the vehicle.

10   Defendant therefore also argues that the Government did not meet its burden to show that the

11   handgun was in plain view before Officer Tompkins entered the vehicle.

12          The Court first addresses whether the police were required to obtain a search warrant to

13   search Defendant's automobile for marijuana or other contraband.  The Supreme Court has long

14   recognized an exception to the Fourth Amendment's warrant requirement in regard to probable

15   cause searches of automobiles.  In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.

16   543 (1925), the Court held that warrantless searches of automobiles based on probable cause to

17   search for contraband are justified under the Fourth Amendment because motor vehicles can be

18   quickly moved out of the locality or jurisdiction in which the warrant must be sought.  Later

19   Supreme Court cases also justified a less rigorous warrant requirement for automobile searches on

20   the grounds that the expectation of privacy with respect to one's automobile is significantly less

21   than that relating to a person's home or office.  *South Dakota v. Opperman*, 428 U.S. 364, 367, 96

22   S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976); *Florida v. White*, 526 U.S. 559, 563-64, 119 S.Ct. 1555,

23   1558-9, 143 L.Ed.2d 748 (1999); *United States v. Brooks*, 610 F.3d 1186, 1193-94 (9th Cir. 2010);

24   *United States v. Pinela-Hernandez*, 262 F.3d 974, 978 (9th Cir. 2001); and *United States v. Albers*,

25   136 F.3d 670, 672-73 (9th Cir. 1998).  In *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982

26   (1991), the Court held that the police may also search closed containers in the vehicle in which the

27

28

1   objects of the search may reasonably be found.[3]

2       Probable cause to search is defined "as a fair probability that contraband or evidence of a

3   crime will be found in a particular place" and is evaluated in light of the totality of the

4   circumstances. *United States v. Pinela-Hernandez*, 262 F.3d at 978, citing *Illinois v. Gates*, 462

5   U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  Although the incident in this case began as

6   a routine traffic stop, it quickly developed into something more.  Upon making contact with

7   Defendant, Officer Ficklin observed the odor of marijuana emanating from his vehicle.  He also

8   observed what appeared to be marijuana particles on Defendant's lap.  When Officer Ficklin asked

9   Defendant if there was anything in the vehicle that the officer should know about, Defendant

10  responded that he had a "blunt," a marijuana cigarette.  This is confirmed by the COPS video.  In

11  *United States v. Barron*, 472 F.2d 1215, 1216-17 (9th Cir. 1973), the defendant sped away from a

12  secondary inspection area at a border crossing and then abandoned his vehicle.  A pursuing agent

13  jumped into the car to stop it and observed a strong odor of marijuana emanating from it.  In

14  upholding the warrantless search of the vehicle, the court stated that "the fact that an agent familiar

15  with the odor of marijuana, smelled such an odor emanating from the automobile when he jumped

16  into it to stop it, alone was sufficient to constitute probable cause for a subsequent search for

17  marijuana."  Several other cases have upheld a finding of probable cause to search a vehicle based

18  on an officer's observation of an odor of marijuana and other signs of its presence in a vehicle.  *See*

19  *United States v. Turner*, 119 F.3d 18, 21 (D.C. Cir. 1997), and cases cited therein.  Officer Ficklin's

20  observations and Defendant's statement that he had a "blunt" were also sufficient to give rise to

21  probable cause to search his vehicle for marijuana.

22  . . .

23

24      [3] *Arizona v. Gant*, 129 S.Ct. 1710, 1723-24 (2009) is consistent with the foregoing cases.  In

25  *Gant* the Court held that police may search a motor vehicle incident to a recent occupant's arrest
    for purposes of officer safety only if the arrestee is within reaching distance of the passenger

26  compartment at the time of the search or because it is reasonable to believe that the vehicle contains
    evidence of the offense of arrest.  Neither reason justified the search in *Gant* because the defendant

27  was in custody in the officer's patrol car when his vehicle was searched and the officers did not

28  have probable cause to search his vehicle based on an arrest for driving on a suspended license.

1    Other suspicious circumstances also supported probable cause to search Defendant's

2  vehicle.  Officer Ficklin testified that Defendant appeared to be nervous and had his feet in an

3  unusual position against the driver's seat when the officer initially made contact with him.  More

4  telling, Defendant fled from Officer Ficklin after exiting his vehicle.  As the Supreme Court stated

5  in *Illinois v. Wardlow*, 528 U.S. 119, 124-125, 120 S.Ct. 673, 676 (2000), "[h]eadlong flight-

6  wherever it occurs-is the consummate act of evasion:  It is not necessarily indicative of

7  wrongdoing, but it is certainly suggestive of such."  *See also United States v. Brown*, 636

8  F.Supp.2d 1116, 1124 (D.Nev. 2009).  After Defendant was taken into custody, the plastic pouch

9  containing marijuana was found in the area where Defendant had fled.  This discovery, however,

10  apparently occurred after Officer Tompkins was instructed to secure the vehicles and, therefore,

11  was not a fact known to the officers at the time Officer Tompkins entered the vehicle.  Regardless

12  of this, the police clearly had probable cause to search Defendant's vehicle for marijuana and they

13  were not required to obtain a search warrant.  It does not matter, therefore, whether the handgun

14  was in plain view.  Even if it was completely concealed beneath the seat when Officer Tompkins

15  entered the vehicle, its discovery did not violate the Fourth Amendment.

16    **(C)**    **Inventory Search.**  Although it is unnecessary for the Court to decide whether the

17  officers' initial entry into the vehicle was a proper inventory search pursuant to an impoundment of

18  the vehicle, the Court will also address this issue which was a primary focus of the parties'

19  arguments.

20    The Ninth Circuit states that once a vehicle has been impounded, the police may conduct an

21  inventory search.  *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989), citing *South*

22  *Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976).  The

23  reasons for conducting an inventory search are threefold: (1) the protection of the vehicle owner's

24  property; (2) the protection of the police against claims by the owner; and (3) the protection of the

25  police from potential danger.  *Id.*  "[I]n order to ensure that the inventory search is 'limited in scope

26  to the extent necessary to carry out the caretaking function,' it must be carried out in accordance

27  with the standard procedures of the local police department."  *Id.*, quoting *Opperman*, 428 U.S. at

28  375, 96 S.Ct. at 3100.  *United States v. Cormier*, 220 F.3d 1103, 1111 (9th Cir. 2000) notes that

9

evaluation of an inventory search is an exception to the general rule that state law violations do not require suppression of evidence in federal court. The failure to follow police procedures or state rules governing inventory searches invalidates a search conducted on that basis. *See also United States v. Maddox*, 614 F.3d 1046, 1049 (9th Cir. 2010).

The Las Vegas Metropolitan Police Department's (LVMPD) vehicle inventory search policy states as follows:

> An inventory is not a search for evidence of crime, but is justified to protect an owner's property while it is in custody of the police, to ensure against claims of lost or stolen property, and to guard the police from danger.

> When a vehicle is lawfully impounded (See 5/204.06) an officer shall conduct an inventory search of that vehicle and containers found therein and report all personal property on the LVMPD 503, Vehicle Impound .

> Report. If the inventory is part of a vehicle seizure (See 5/205.14), the personal property will be impounded and placed in the evidence vault.

> The impound/inventory involves two levels of decision making and action by the officer. There is the impoundment of the vehicle and the inventory search itself. Both of these actions must be done pursuant to standardized criteria which limits the discretion of the officer and ensures that impoundment/inventory are legally performed and not a guise for a general exploratory search.

*Hearing Exhibit "E"*, LVMPD Motor Vehicle Search Policy, Section 5/200.04.

As the court recently stated in *United States v. Minor*, 2010 WL 1276659 (D.Nev. 2010) at *6, determining whether a particular inventory search complies with the foregoing policy requires a two part inquiry. First, was the vehicle properly impounded? Second, was the inventory search properly performed?

Section 5/204.06 of the LVMPD policy or procedure sets forth the circumstances under which a vehicle may be impounded. The procedure lists the following circumstances that might have been a basis for impounding Defendant's vehicle: "9. When an abandoned vehicle causes an immediate threat to other motorists by its location or cargo, immediately after citing the vehicle" or "12. If there is not a licensed driver in the vehicle and it is not legally parked." *Hearing Exhibit "F"*. Section 5/204.06 states that whenever a vehicle is towed, a Vehicle Impound Report will be

1  completed.  The impound procedure also provides that an impounded vehicle may be released to

2  the registered or legal owner prior to being towed from the scene if the impounding officer

3  determines that the need for the tow has been eliminated.  The Vehicle Impound Report will reflect

4  that the vehicle was released and to whom.  *Id.*

5        Section 5/202.20 of the LVMPD policy or procedure also governs the disposition of an

6  arrested subject's vehicle.  *Hearing Exhibit "D".*  It states:

> The arresting officer has the option of asking the arrestee whether he
> wishes to park his vehicle or have it towed, if the following
> conditions exist:
>
> 1.   Arrestee is 18 years or older.
>
> 2.   Arrestee is not under the influence of intoxicating
>      liquors or drugs.
>
> 3.   Arrestee is in lawful possession of the vehicle.
>
> 4.   The vehicle is not needed for evidence.

14  This section further states that "[a]ll personnel are encouraged to utilize this procedure

15  whenever possible."  *Id.*

16        Although the police had arguable grounds to impound Defendant's vehicle and conduct an

17  inventory search of it, the Government failed to present sufficient evidence that the initial search of

18  Defendant's vehicle was, in fact, an inventory search pursuant to a decision to impound the vehicle.

19  Officer Ficklin testified that he believed Defendant's vehicle was going to be impounded once he

20  was taken into custody.  There is no evidence, however, that this information was communicated to

21  Officer Tompkins.  The evidence shows only that Officer Tompkins was told to go and secure

22  Officer Ficklin's and Defendant's unattended vehicles.  There is no evidence that he was told to

23  impound Defendant's vehicle or that he began the impound process on his own volition.

24        The Court is dubious of characterizing the search of a suspect's motor vehicle, after the fact,

25  as an inventory search where nothing in the record shows that the impound process was actually

26  begun before the search was conducted.  Accordingly, the initial search of Defendant's vehicle

27  cannot be justified as an inventory search pursuant to the impounding of the vehicle.  Because the

28  police had probable cause to search Defendant's vehicle for marijuana, however, they were not

11

1    required to obtain a search warrant before entering the vehicle.  Therefore, Officer Tompkins'

2    initial entry into the vehicle and discovery of the handgun did not violate the Fourth Amendment.

3    **2.    Whether Defendant's *Miranda* Rights Were Violated.**

4    **(A)    Defendant's Pre-*Miranda* Statements.**   Prior to custodial interrogation, law

5    enforcement officials must inform a suspect of his *Miranda* rights.  *United States v. Mejia*, 559

6    F.3d 1113, 1117 (9th Cir. 2009), citing *Duckworth v. Egan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 106

7    L.Ed.2d 166 (1989).  Defendant argues that the statements he made in response to Officer Ficklin's

8    question or statements after he was captured should be suppressed because he was not advised of

9    his *Miranda* rights.

10    The first issue is whether Defendant was in custody when these statements occurred.  The

11    determination of custody is based on the totality of the circumstances and is viewed from the

12    standpoint of whether a reasonable person in such circumstances would conclude that he or she is

13    not free to leave.  *United States v. Brobst*, 558 F.3d 982, 995 (9th Cir. 2009), citing *United States v.*

14    *Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).  Factors relevant to whether an accused is in custody

15    include (1) the language used to summon the individual; (2) the extent to which the individual is

16    confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the

17    duration of the detention; and (5) the degree of pressure applied to detain the individual.  *Id.*

18    In arguing that Defendant was not in custody, the Government relies on *United States v.*

19    *Galindo-Gallegos*, 244 F.3d 728 (9th Cir. 2001).  In that case, the defendant was in a group of

20    people who ran from two border patrol agents near the Mexican border.  After defendant and others

21    were caught by the officers, they were seated on the ground and the agents asked them what country

22    they were from and whether they had the legal right to be in the United States.  The agents did not

23    advise the group of their *Miranda* rights before this questioning.  The court stated that the material

24    circumstances pertaining to custody were that:  (1) The questioning took place out of doors; (2) the

25    location was isolated, away from the general public, but there were 15 or 20 aliens and only 2 law

26    enforcement officials present; (3) no one was handcuffed, but everyone was required to sit on the

27    ground; (4)  the questions were a necessary predicate to letting everyone go free, but were also

28    reasonably likely to elicit incriminating admissions by those for whom the facts were incriminating;

12

1    and (5) the group of aliens had been caught running very near the border and defendant had

2    persisted in running away, but was caught and returned to the group that had been seated on the

3    ground.

4            In holding that the defendant was not in custody for purposes of *Miranda*, the court relied

5    on *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138 (1984), in which the Supreme Court held

6    that the roadside questioning of a motorist detained during a traffic stop did not amount to custodial

7    interrogation. *Berkemer* stated that traffic stops are presumptively temporary and brief and a

8    motorist's general expectations when stopped for a traffic violation are that he will be obliged to

9    spend a short period of time answering questions and being issued a citation, but will then be

10   allowed to continue on his way.  Second, traffic stops typically take place in public, in view of

11   passing motorists and pedestrians, and usually involve only one or two officers.  This reduces the

12   ability of an unscrupulous officer to elicit self-incriminating statements and diminishes the

13   motorist's fear that if he does not cooperate he will be subject to abuse. *Berkemer*, 468 U.S. at 437-

14   439, 104 S.Ct. at 3149.  The Court also stated that a police officer's unarticulated intent to arrest

15   the person is immaterial to the custody determination because the relevant inquiry is whether a

16   reasonable innocent person in such circumstances would believe he is not free to leave. *Id.* 468

17   U.S. at 442, 104 S.Ct. at 3151; *Galindo-Gallegos*, 244 F.3d at 731.

18           In *United States v. Medina-Villa*, 567 F.3d 507, 518-20 (9th Cir. 2009), the court followed

19   *Galindo-Gallegos* in holding that the defendant was not in custody when a border patrol agent

20   stopped a vehicle in which defendant was a passenger and ordered the occupants out at gunpoint.

21   The court noted that *Galindo-Gallegos* was based, in part, on the particular circumstances relating

22   to suspected illegal aliens detained near the border and the need for border patrol agents to quickly

23   determine whether they are legally or illegally in the country.  The court cited *United States v.*

24   *Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), which held that an

25   officer may stop and briefly detain individuals whom the officer reasonably suspects are illegally in

26   the country to question them about their citizenship and immigration status.

27           This case, of course, does not involve the detention of a potential illegal alien at or near the

28   border.  The facts are also distinguishable from *Berkemer*.  Although Defendant Dillard was

1    initially subject only to non-custodial detention, he fled from that detention and was then captured

2    and forcibly detained at gunpoint.  He was surrounded by four to five officers and was required to

3    lie on the ground in a spread-eagled position until he was handcuffed and stood up on his feet by

4    the officers.  Although Defendant was captured in a open hotel parking lot, it does not appear from

5    the COPS video that there were any civilians (other than the film crew) in the vicinity at the time he

6    was detained and initially questioned.  A reasonable person in Defendant's situation would not

7    believe he was free to leave.  The Court therefore finds that Defendant Dillard was in custody

8    before Officer Ficklin asked him why he ran.

9            Even assuming that Defendant was not in custody when Officer Ficklin first asked him why

10    he ran, he was clearly in custody when Officer Ficklin made his subsequent statements to which

11    Defendant gave a non-verbal response.  After the officers found the marijuana pouch that

12    Defendant allegedly dropped while fleeing, Officer Ficklin told him that there were no warrants for

13    his arrest, but that the officers had found the marijuana.  Officer Ficklin told the Defendant that he

14    assumed or believed he ran because he knew the officer would find the marijuana on his person.

15    Defendant nodded his head affirmatively in response to this statement.  Officer Ficklin, in effect,

16    confronted Defendant with information contrary to his initial explanation for fleeing and also with

17    evidence of his guilt.  This is an additional factor that supports the finding that Defendant was in

18    custody. *United States v. Brobst*, 558 F.3d at 995.  Officer Ficklin's statements also constituted

19    interrogation.  In *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90 (1980), the

20    Court stated that interrogation includes "words or actions on the part of the police (other than those

21    attendant to arrest and custody) that the police should know are reasonably likely to elicit an

22    incriminating response from the suspect."  *See also United States v. Chen*, 439 F.2d 1037, 1040 (9th

23    Cir. 2006).  Officer Ficklin's statements were clearly likely to elicit a response from Defendant and,

24    in fact, did so.

25            Because Defendant was in custody, the Government should be precluded from introducing

26    in its case-in-chief Defendant's *pre-Miranda* responses to Officer Ficklin's question and statements

27    relating to why Defendant fled.

28    . . .

14

1    **(B)   Defendant's Post-*Miranda* Statements.**  After the officers were informed that a

2    gun had been found in Defendant's automobile, Defendant was placed in the backseat of a patrol

3    car and Officer Ficklin gave him the *Miranda* warnings.  In response to further questions by Officer

4    Ficklin, Defendant admitted that the marijuana was his, but denied any knowledge of the gun found

5    in vehicle.  Thereafter, Defendant was driven back to Paradise Road where his automobile was

6    parked.  Detective Meyers testified that he also advised Defendant of his *Miranda* rights.  In

7    response to questions from Detective Meyers, Defendant admitted that he used marijuana.  He also

8    allegedly told Detective Meyers that he purchased methamphetamine from Hispanic gang members

9    for sale in the African-American community.  Defendant, however, again denied any knowledge

10   about the firearm found in his vehicle.

11          The Court accepts the testimony of Officer Ficklin and Detective Meyers that they

12   separately informed Defendant of his *Miranda* rights and that after being informed of his rights,

13   Defendant admitted possession of the marijuana and also being involved in the sale of drugs, but

14   denied any knowledge about the firearm.  Although Defendant attacks the credibility of Detective

15   Meyers' testimony that he advised Defendant of his *Miranda* rights, the Court would have to also

16   find that Officer Ficklin did not inform Defendant of his rights in order for Defendant's statements

17   to Detective Meyers to be inadmissible based on the failure to inform him of his *Miranda* rights.

18          Defendant also argues that his post-*Miranda*  statements should be suppressed because his

19   admissions in response to pre-*Miranda* interrogation tainted the voluntariness of his alleged waiver

20   of rights after he was given the *Miranda* warnings.  In *Oregon v. Elstad*, 470 U.S. 298, 314,105

21   S.Ct. 1285, 1296 (1985), however, the Supreme Court held that "absent deliberately coercive or

22   improper tactics in obtaining the initial statement, the mere fact that a suspect has made an

23   unwarned admission does not warrant a presumption of compulsion.  A subsequent administration

24   of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily

25   should suffice to remove the conditions that precluded the admission of the earlier statement."

26   Here, there is no evidence that Officer Ficklin engaged in deliberately coercive or improper tactics

27   in obtaining Defendant's initial statements.  Defendant's post-*Miranda* statements are therefore

28   admissible.

15

3.        <u>Alleged Willful Destruction of Evidence</u>.

Defendant argues that evidence obtained as a result of the stop should be suppressed because the police willfully failed to take steps to preserve all of the COPS video that was recorded during the incident.  Defendant represented in his motion that the LVMPD has an agreement with COPS that the police can preserve any and all video of arrests or stops.  Defendant also stated that COPS' representatives informed his counsel that they kept all of the video footage of the stop for a least a month and up to three months after Defendant's arrest.  COPS reportedly did not receive any request from the LVMPD to preserve the video and it was therefore deleted or destroyed except for those portions that were used in the television program.

Defendant did not present any testimony or evidence at the evidentiary hearing in support of his claim that the police willfully destroyed exculpatory evidence.  Defendant's motion to suppress on this ground may therefore be deemed abandoned.  In any event, Defendant had failed to meet his burden to show that the Government or the police willfully failed to preserve potentially exculpatory evidence.[4]  In *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993), the Ninth Circuit held that to establish a constitutional due process violation based on the failure to preserve evidence, the defendant must show (1) that the unavailable evidence possessed exculpatory value that was apparent before the evidence was destroyed; (2) that defendant was unable to obtain comparable evidence by other reasonably available means; and (3) that the government acted in bad faith in failing to preserve the evidence.  *Cooper* noted that "[t]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed."  *Id. ,* 983 F.2d at 931, citing *Arizona v. Youngblood*, 488 U.S. 51, 56-57, 109 S.Ct. 333, 336-337, 102 L.Ed.2d 281 (1988).  The Defendant has not produced any evidence that anything of an exculpatory nature occurred during the incident that might have been recorded by the COPS film crew.  Nor, for that reason, has he shown that the police or the Government were aware of the  exculpatory value of the COPS video before it was destroyed.  Defendant's motion to

---

[4] Defendant did not request production of the COPS video from the Government pursuant to Rule 16 of the Federal Rules of Criminal Procedure.  The sole basis for Defendant's motion is the Government's affirmative obligation under *Brady* to produce exculpatory information.

1    suppress evidence based on the failure to preserve evidence should therefore be denied.

2                                              **CONCLUSION**

3             The initial discovery of the handgun did not violate the Fourth Amendment because the

4    police had probable cause to search Defendant's vehicle for marijuana or other contraband and no

5    warrant was required to do that.   Defendant's initial verbal and non-verbal statements to Officer

6    Ficklin should be suppressed because he was in custody and was not advised of his *Miranda* rights.

7    The statements that Defendant voluntarily made after being informed his rights, however, are

8    admissible.   Finally, Defendant has failed to meet his burden to show that the Government or the

9    Las Vegas Metropolitan Police Department, in bad faith, failed to preserve and produce exculpatory

10   evidence.   Defendant's motion to suppress on that ground should therefore be denied.   Accordingly,

11                                           **RECOMMENDATION**

12           **IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence (#24) should be

13   granted in regard to his motion to suppress statements made by him after he was taken into custody

14   but before *Miranda* warnings were given to him.   The remainder of Defendant's motion should be

15   denied.

16                                               **NOTICE**

17           Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

18   in writing and filed with the Clerk of the Court within fourteen (14) days.   The Supreme Court has

19   held that the courts of appeal may determine that an appeal has been waived due to the failure to

20   file objections within the specified time.   *Thomas v. Arn*, 474 U.S. 140, 142 (1985).   This circuit

21   has also held that (1) failure to file objections within the specified time and (2) failure to properly

22   address and brief the objectionable issues waives the right to appeal the District Court's order

23   and/or appeal factual issues from the order of the District Court.   *Martinez v. Ylst,* 951 F.2d 1153,

24   1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

25           DATED this 16th day of December, 2010.

26

27                                               _____
                                                 GEORGE FOLEY, JR.
                                                 United States Magistrate Judge
28

                                                    17